### HENRY BRODERICK, Inc., v. SQUIRE.
### No. 11596.

Circuit Court of Appeals, Ninth Circuit.
Oct. 10, 1947.

Eggerman, Rosling & Williams, D. G. Eggerman and Joseph J. Lanza, all of Seattle, Wash., for appellant.

Theron L. Caudle, Asst. Atty. Gen., Sewall Key, A. F. Prescott and Rhodes S. Baker, Jr., Sp. Assts. to Atty. Gen., J. Charles Dennis, U. S. Atty., of Seattle, Wash., Harry Sager, Asst. U. S. Atty., of Tacoma, Wash., for appellee.

Before DENMAN, STEPHENS and ORR, Circuit Judges.

ORR, Circuit Judge.

Three causes of action were brought for the recovery of taxes assessed by the government and paid under protest by appellant under the Federal Insurance Contributions Act, Ch. 9, subc. A of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, § 1400 et seq., for the period from April 1, 1943 to March 31, 1945, and under the Federal Unemployment Tax Act, Ch. 9, subc. C of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, § 1600 et seq., for the years 1943, 1944. All the taxes were paid August 4, 1945. Claims for refund were filed August 11, 1945 and rejected by notice dated January 2, 1946. This action was commenced on February 13, 1946 in the United States District Court for the Western District of Washington, within the time provided by § 3772(a) (2) of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.

Code, § 3772(a) (2). A judgment dismissing the complaint was rendered.

The Commissioner held the relationship of employer-employee existed between appellant and the real estate brokers involved herein. The District Court took the same view. We do not agree. We think the brokers are independent contractors.

Appellant is a corporation licensed as a real estate broker in the state of Washington and having three departments, Property Management, Real Estate, and Insurance. In addition to those involved in the relationship here in question, appellant employs 11 or 12 real estate salesmen who work in the Property Management section, and whose licenses, as distinguished from the brokers, are paid for by the company. The real estate salesmen are on the regular payroll, are required to attend meetings, are given daily assignments, spend most of their time in property management, and only 25 per cent of their time on sales. They are directed to see specific prospects, are required to report back and receive, on their regular salary day, an additional percentage of the premium if they consummate a sale. These salesmen are admittedly employees.

The brokers whose status is involved work out of the Real Estate Department. Prior to 1937 or 1938, their relationship was not evidenced by any contract. As of 1937 or 1938 written contracts were used. There was no difference in the operation under their oral agreement and written agreement. Both parties warranted they were licensed brokers, would retain their licenses, and pay all fees arising out of their activities as brokers. Appellant agreed to furnish desk, telephone and switchboard service. Brokers agreed to use best efforts to sell. Under the contract brokers bear all transportation and entertainment costs in seeing prospects. The brokers exercise entire discretion as to the manner in which they operate and it is expressly provided in the contract that broker is an "independent contractor, and not a servant, employee, joint adventurer or partner" of appellant. The brokers are not required to maintain office routine, or keep regular hours, and may engage in business other than real estate. They do most of their work outside the office, and a large part at home. They determine their own strategy, secure their licenses at their own expense, and carry no insignia of appellant on their cars. They are not compelled to attend meetings held for the brokers' benefit and do not attend salesmen's meetings. Some real estate listings they obtain and others they receive from appellant. The first broker to get a deposit on a listing placed with all the brokers receives a part of the commission. When a money deposit is received on a sale it is placed in an escrow account kept by appellant. The commission is divided simultaneously with the closing of the sale, and at that time appellant deposits its half for the first time in its profit and loss account.

A broker's name is often listed by appellant in its advertisement, but this does not ordinarily prevent other brokers from working on the same sale.

The district court found that the appellant reserved the right to place in the temporary possession of any of the brokers exclusive privileges of sale, and that either appellant or brokers could terminate the relationship at will, and further found that the money paid the brokers by appellant was "wages".

The Social Security Act, 42 U.S. C.A. § 301 et seq., was enacted in 1935 to solve the problem of insecurity brought on by old age and unemployment. The method is to provide for payments in the nature of annuities to the elderly and compensation to the unemployed. United States v. Silk, and, Harrison v. Greyvan Lines, 67 S.Ct. 1463, 91 L.Ed.——. Revenue is obtained from the collection of employment taxes. No definition of employee is included in the Act nor are any standards set forth for such determination except that it is provided that "employment" means "any service, of whatever nature, performed * * * by an employee for the person employing him, * * * except * * *". §§ 811(b), 907(c), Int.Rev.Code, 26 U.S. C.A. §§ 1426(b), 1607(c).

The Supreme Court was called upon to determine the meaning of the word "employee" in connection with the National

Labor Relations Act, 29 U.S.C.A. § 151 et seq., and rejected the "technical concepts pertinent to an employer's legal responsibility to third persons for the acts of his servants" and held that the word "employee" was not a word of art. The primary consideration was held to be the effectuation of the purposes and policies of the Act. N.L.R.B. v. Hearst, 322 U.S. 111, 64 S.Ct. 851, 859, 88 L.Ed. 1170.

█ Likewise it has been consistently held that a narrow and legalistic interpretation of the scope of the Act here in question would not be in conformance with the broad purposes of federal social security legislation. Social Security Board v. Nierotko, 327 U.S. 358, 66 S.Ct. 637, 90 L.Ed. 718, 162 A.L.R. 1445.

On the other hand, the Supreme Court, in a recent decision rendered after the decision of the district court in the instant case, said:

"There is no indication that Congress intended to change normal business relationships through which one business organization obtained the services of another to perform a portion of production or distribution. Few businesses are so completely integrated that they can themselves produce the raw material, manufacture and distribute the finished product to the ultimate consumer without assistance from independent contractors. The Social Security Act was drawn with this industrial situation as a part of the surroundings in which it was to be enforced. Where a part of an industrial process is in the hands of independent contractors, they are the ones who should pay the social security taxes." United States v. Silk, and, Harrison v. Greyvan Lines, Inc., supra [67 S.Ct. 1468]. In this opinion the Supreme Court held that truck drivers involved in both the Silk and Greyvan cases, were not employees as the Commissioner of Internal Revenue contended, but were in fact independent contractors. In arriving at its decision the court enunciated a non-inclusive list of tests to be applied in determining the existence of an employer-employee relationship. These tests included degree of control, opportunities for profit or loss, investment in facilities, permanency of relation and skill required in the claimed independent operation.

A comparison of the facts in the instant case with those in the above two cases, especially the Greyvan case, compels the conclusion that the brokers here considered are independent contractors. The truckmen in the Greyvan case were required to paint "Greyvan Lines" on their trucks, to collect all money due the company from shippers or consignees, and to turn in such moneys at the office to which they reported after delivering a shipment. They were required to follow all rules and regulations of the company. The company's instructions covered directions to the truckmen as to where and when to load freight. As remuneration, the truckmen were to receive a percentage of the tariff charged by the company varying between 50 and 52 per cent and a bonus up to three per cent for satisfactory performance of the service. The contract was terminable at will. The truckmen were required to take a short course of instruction in the company's methods. They were required to follow the orders of the company's dispatchers with regard to their movements, and to report their positions at intervals. All permits, certificates and franchises necessary to the operation of the vehicle as a motor carrier under federal and state laws were to be obtained at the company's expense.

By contrast, the appellant in this case exercises a minimum of control over the brokers, who are not compelled to attend meetings, make reports, keep regular hours or make any specific calls. In fact, they are free to come and go as they please, plan their own strategy, and give as little or as much time to appellant's business as they desire.

Like the drivers in the Silk and Greyvan cases, they are "small businessmen" in so far as they must pay their own expenses such as automobile insurance, repairs, oil, gasoline and license fees. The brokers must make a further investment in brokerage licenses. There is also a similarity between the brokers and truck drivers in that the relationships are terminable by either party. The brokers' opportunities for prof-

 

it and loss depend entirely upon their own initiative and skill.

 The application of the tests laid down in the Silk and Greyvan cases, supra, to the facts in the instant case, and a comparison of the facts in the Silk and Greyvan cases with the facts in the instant case firmly establish the brokers to be independent contractors and not employees of appellant.

Judgment reversed.